# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>One LG Cricket cellular telephone, bearing IMEI# 354660118316259, including SIM card contained therein, held in evidence and associated with Homeland Security Investigations (HSI), case 2S07QS212S0002, currently stored in the HSI Evidence Room in Greeley, Colorado and more fully described in Attachment A, attached hereto. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 21-sw-00587-SKC

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the __State and__ District of __Colorado__ *(identify the person or describe property to be searched and give its location)*:

SEE **"ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit
The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

SEE **"ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

   X  evidence of a crime;

   X  contraband, fruits of crime, or other items illegally possessed;

   X  property designed for use, intended for use, or used in committing a crime;

   ☐  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of __18__ U.S.C. §§ 2250, 2251, 2252A, and 2422, and the application is based on these facts:

   X  Continued on the attached affidavit, which is incorporated by reference.

   ☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Darrell Franklin*
*Applicant's signature*

Darrell Franklin, Special Agent, HSI
*Printed name and title*

Sworn to before me and:   ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:  __05/24/2021__

*Judge's signature*

City and state:  __Denver, CO__

Magistrate Judge S. Kato Crews
*Printed name and title*

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

One LG Cricket cellular telephone, bearing IMEI# 354660118316259, containing one SIM card (hereinafter and in Attachment B the "Device(s)"), currently being held at the HSI Evidence Room, 4645 W. 18th Street, Suite 500, Greeley, Colorado, 80634.

## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

For the Device(s) listed and described in Attachment A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 18, United States Code, Sections 2250(a)(1), (2)(B), and (3); 2251(a) and (e); 2252A(a)(2) and (b)(1); and 2422(b) (hereinafter "Subject Offenses"):

1. Images or visual depictions of child pornography;

2. Records and information containing child erotica, including texts, images and visual depictions of child erotica;

3. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of the Subject Offenses;

4. Any and all information, notes, documents, records, or correspondence, in any format or medium, pertaining to child pornography or sexual activity with or sexual interest in minors;

5. Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning Internet activity reflecting a sexual interest in minors or child pornography;

6. Any and all information, notes, software, documents, records, or correspondence, in any form and medium pertaining to any minor who is, or appears to be, the subject of any visual depiction of child pornography, child erotica, sexual activity with other minors or adults, or of sexual interest, or that may be helpful in identifying any such minors;

7. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Device(s) or by other means for the purpose of committing violations of the Subject Offenses;

8. Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning membership in online groups, clubs, or services that provide or make accessible child pornography;

9. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of the Subject Offenses;

10. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of the Subject Offenses;

11. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of the Subject Offenses or that show who used, owned, possessed, or controlled the Device(s);

12. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device(s), or that aid in the identification of persons involved in violations of the Subject Offenses;

13. Credit card information, bills, and payment records pertaining to violations of the Subject Offenses;

14. Information about usernames or any online accounts or email addresses that include "Daniel Patterson;"

15. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of the Subject Offenses;

16. Evidence of who used, owned, or controlled the Device(s) to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence;

17. Evidence of software that may allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software;

18. Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

19. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

20. Evidence of how and when the Device(s) were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

21. The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Device(s);

22. Passwords, encryption keys, and other access devices that may be necessary to access the Device(s); and

23. Contextual information necessary to understand the evidence described in this attachment.

24. Any and all information, documents, records, photos, receipts, or correspondence, in any format or medium, pertaining to sex offender registration requirements.

25. Any and all information, documents, records, photos, receipts, telephone bills, or correspondence, in any format or medium, pertaining to Daniel Patterson's location, including interstate travel.

DEFINITIONS:

26. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

27. "Child Pornography" is defined in 18 U.S.C. § 2256(8), which includes as any visual depiction of sexually explicit conduct involving the use of a minor; a digital image, computer image, or computer-generated image that is, or is indistinguishable from that of a minor engaged in sexually explicit conduct; or a visual depiction that has been created, adapted, or modified to appear than an identifiable minor is engaging in sexually explicit conduct.

28. "Visual depiction" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

29. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions; this also includes texts or discussions regarding minors engaged in sexual acts or conduct.

## AFFIDAVIT

I, Darrell Franklin, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1.  I am a Special Agent of U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) and have been since February of 2007.  I am currently assigned to the HSI office in Greeley, Colorado. As part of my duties, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of Title 18, United States Code, Sections 2251, 2252, and 2252A.  I have received training and instruction in the field of investigation of child pornography and have had the opportunity to participate in investigations relating to the sexual exploitation of children.  As part of my training and experience, I have reviewed images containing child pornography in a variety of formats (such as digital still images and video images) and media (such as digital storage devices, the Internet, and printed images).

2.  This affidavit is submitted in support of an application for a search warrant for computers and related equipment (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2250(a)(1), (2)(B), and (3); 2251(a) and (e); 2252A(a)(2) and (b)(1); and 2422(b)..

3.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2250, 2251, 2422, and 2252A are located in the place described in Attachment A.

4.  The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## RELEVANT STATUTES

5.  This investigation concerns alleged violations of 18 U.S.C. Sections 2250(a)(1), (2)(B), and (3); 2251(a) and (e); 2252A(a)(2) and (b)(1); and 2422(b), relating to material involving the sexual exploitation of minors, coercion and enticement, and failure to register as a sex offender.

6.  A sex offender who is required to register under SORNA, travels in interstate commerce, and knowingly fails to register or update a registration as required by SORNA violates 18 U.S.C. Section 2250(a), Failure to Register.

7.  18 U.S.C. Section 2251(a) and (e) prohibits a person from employing, using, persuading, inducing, enticing or coercing a minor to engage in any sexually explicit conduct (child pornography) for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, or attempting to do so.

8.  18 U.S.C. Section 2422(b) prohibits a person from using the mail or any facility or means of interstate or foreign commerce to knowingly persuade, induce, entice, or coerce any individual who

has not attained the age of 18 years to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempting to do so.

9.  18 U.S.C. Section 2252A(a)(2) and (b)(1) prohibits a person from knowingly receiving child pornography using any means or facility of interstate or foreign commerce or which has been mailed, shipped, or transported in or affecting interstate or foreign commerce,), or attempting to do so.

## DEFINITIONS

10. The following definitions apply to this Affidavit and Attachment B to this Affidavit.

11. "Child Pornography" includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

12. "Visual depictions" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

13. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

## IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

14. One LG Cricket cellular telephone, bearing IMEI# 354660118316259, containing one SIM card (hereinafter and in Attachments A and B the "Device(s)") is currently held in evidence at the HSI Evidence Room in Greeley, Colorado.  The cellular telephone is being held in evidence under case number 2S07QS212S0002.

15. Your Affiant believes there is probable cause to believe that the Device(s) are or contain evidence, fruits, and instrumentalities of violations of 2250(a)(1), (2)(B), and (3); 2251(a) and (e); 2252A(a)(2) and (b)(1); and 2422(b).  The applied-for warrant would authorize the forensic examination of the Device(s) for the purpose of identifying electronically stored data particularly described in Attachment B.

16. The Device(s) are currently in the lawful possession of the HSI.  They came into the HSI's possession in the following way: The LG Cricket cellular telephone belonged to Daniel Patterson and was seized on March 31, 2021 in conjunction with the execution of an arrest warrant that had been issued in the Logan County District Court in Logan County, Colorado in criminal docket number 2021CR101.  When Patterson was arrested in his vehicle, the LG Cricket phone was sitting on the driver's seat in plain view, as further described below.  Patterson identified the LG Cricket phone as his personal property.

17. On April 2, 2021, Inv. Jones applied for and was granted a search warrant in the Logan County District Court in Logan County, Colorado which authorized a search of Patterson's LG Cricket cell phone for: GPS devices, or other mobile devices for all contacts; calls and call logs including incoming, outgoing, and missed phone calls; pictures/images, audio and video files; text files;

2

incoming, outgoing, and draft text/video/image or MMS messages; incoming, outgoing and draft email messages; chat logs and/or chat programs, applications, voicemail; PIN codes, PUK codes, passcodes, and passwords; Any notes, appointments, calendars, communications and complete file system and memory content; GPS data, cell phone tower data, internet history, wireless network data, and to also search the phones and all memory cards/removable media, SIM cards for the same and any deleted content/files. Your Affiant seeks this warrant to be certain that an examination of the Device(s) will comply with the Fourth Amendment and other applicable laws.

18. The Device(s) are currently in storage at the HSI Evidence Room at 4645 W. 18th Street, Suite 500, Greeley, Colorado, 80634.  In my training and experience, I know that the Device(s) all have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Device(s) first came into the possession of HSI.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19. Based on my training and experience, your Affiant knows about the following items, hereinafter and below and in the Attachments "Device(s)."

20. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites.  Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices.  A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices.  A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords.  Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts.  Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet.  They operate as GPS navigation devices and can store information about where they have been.  They also contain digital cameras. The camera can mark a photo with location data so that upon examination it can be determined where and when a photo was taken.  These images can sometimes be recovered even if the user has deleted the image.  The smartphone can also connect to the internet using wireless connections, which allow for images, files and other information to be uploaded directly to the Internet or to other digital storage devices or computers.  Smartphones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations.  They can also operate as a "tablet," or mobile computer, and can contain software programs called applications.  Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

21. Based on my knowledge, training, and experience, your Affiant knows that computers and digital storage devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

22. Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

23. There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

    A. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    B. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    C. Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    D. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

24. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device(s) that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were used, the purpose of the use, who used the Device(s), and when. There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

    A. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the

4

attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

B. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C. A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D. The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F. Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, particularly crimes involving the sexual exploitation of children, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime.

G. Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

H. A single compact disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Thumb drives with a capacity of 32 gigabytes are not uncommon. Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon. These drives can store thousands of images and videos at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

25. *Need to review evidence over time and to maintain entirety of evidence.* Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to

the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

26. *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device(s) consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device(s) or information from a copy of the Device(s) consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device(s) to human inspection in order to determine whether it is evidence described by the warrant.

27. Your Affiant knows from training and experience that seized computers may contain communications to/from an attorney.  If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of one or more government attorneys and other government personnel, as needed, is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will identify and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its review. If the filter team believes that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before providing these attorney communications to the investigative team.   If consulting with

defense counsel is not possible or does not produce an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

## **INVESTIGATION**

28. On March 22, 2021, 13th Judicial District Attorney's Office Investigator Michael Jones conducted a child exploitation investigation based in Sterling, Colorado. Inv. Jones logged into a Facebook account titled "Madison Mae." The profile pictures on "Madison's" account are that of an adolescent girl. The adolescent girl is, in fact, a law enforcement officer during her adolescent years. The law enforcement officer in question provided consent to use these photographs for the purpose of internet luring investigations. This account, referred to hereafter as simply "Madison" is routinely used during the course of the internet luring of a child investigation.

29. On March 21, 2021 at approximately 1624 hours, Inv. Jones received a message from a Facebook account titled "Daniel Patterson (Benefits)." The URL of the page was https://www.facebook.com/daniel.patterson.52831666.

30. On March 25, 2021, Inv. Jones sent a preservation request to Facebook.com for this account. The date of birth on the account was listed as December 13, 1974. Inv. Jones conducted a records check and received a return for Daniel Curtis Patterson with the date of birth December 13, 1974. Inv. Jones noted that the person in Daniel's Colorado DMV photograph appeared to be the same person in the profile pictures on the Facebook.com account titled "Daniel Patterson (Benefits)."

31. On March 26, 2021, Inv. Jones took numerous screenshots of Daniel's Facebook page. Inv. Jones also took a screen recording of a video Daniel had made of himself while sitting on the toilet. The man in the video appeared to be the same person in the DMV photograph of Daniel Patterson. In the above-mentioned video, Daniel speaks to the camera. Inv. Jones noted that his voice in the video appeared to be the same voice in numerous voice clips that were sent to "Madison" during the ensuing chat.

32. Inv. Jones also obtained Daniel's criminal history and noted that he was a registered sex offender out of the State of Oklahoma. The Oklahoma sex offender registry listed Daniel's last known address as 821 Edgewood Dr, Ponca City, Oklahoma 74604. Inv. Jones noted that he had been arrested for 1st degree rape, and later was incarcerated for 2nd degree rape of a minor. He was sentenced to 5 years and was discharged to supervision on March 22, 2019.

33. Oklahoma Sex Offender Registry documents show that Daniel Patterson continued to register at the above-described address through February 10, 2021. However, as described below, Mr. Patterson has been living at 1523 Tennyson Street in Denver, Colorado since approximately March 2020.

34. The following is an excerpt from the Facebook chats that occurred between the Facebook accounts for "Madison" and Daniel Patterson. Inv. Jones noted that he copied and pasted the following messages from the chat between Daniel and "Madison" on March 26, 2021; therefore, messages that were sent and received "yesterday" were sent and received on March 25, 2021. The messages sent from "You" are messages sent from the "Madison" account by a law enforcement officer.

> *Daniel sent March 22 at 4:24 PM*
> *Hi I'm Daniel nice to meet you !,thanks for the add, I gotta say You caught my eye ....where u from??*

*You sent March 23 at 2:43 PM*
*oh thnx .. hahah im from sterling wbu?*

*Daniel sent March 23 at 2:45 PM*
*Ohh nice west denver*
*Are u single*

*You sent March 23 at 2:45 PM*
*lmao yeah nvr had a bf lmao*

*Daniel sent March 23 at 2:46 PM*
*Ohhh wow really ?*
*U like girls ?*

*You sent March 23 at 2:46 PM*
*bahaha no i like boys but dad says i cant date until im 16 lmao*

*Daniel sent March 23 at 2:47 PM*
*Huh?? How young are you ?*

*You sent March 23 at 2:47 PM*
*im 14 lmao .. how old r u?*

*Daniel sent March 23 at 2:47 PM*
*Omg way too old*
*Sorry my badd*

*You sent March 23 at 2:47 PM*
*no worries*

*Daniel sent March 23 at 2:48 PM*
*Ohhh ok enjoy your day*
*Best wishes*

*You sent March 23 at 2:48 PM*
*oh u too*

*Daniel sent March 23 at 2:48 PM*
*Ty bye*

*You sent March 23 at 2:48 PM*
*bye*

*Daniel sent March 23 at 3:11 PM*
*So what u looking 4 ?*

*You sent March 23 at 3:14 PM*
*wht u mean?*

*Daniel sent March 23 at 3:14 PM*
*Just wondering what u looking for*
*On here*

*You sent March 23 at 3:15 PM*
*uh idk .. prolly friends mostly ... just moved out here 2 sterling and its pretty lonely .. especially bein homeskooled and all*

*Daniel sent March 23 at 3:16 PM*
*Ohhh dang i see im sure*
*Well obviously friends .. U a int had a bf yet*

*You sent Yesterday at 10:47 AM*
*bahaha yaa*

*Daniel sent Yesterday at 11:12 AM*
*Dammm it*

*You sent Yesterday at 11:21 AM*
*bahaha wht?*

*Daniel sent Yesterday at 11:21 AM*
*No bf*

*You sent Yesterday at 11:21 AM*
*bahaha not my fault lmao*

*Daniel sent Yesterday at 11:23 AM*
*Loi ohhh yeah*

*You sent Yesterday at 11:23 AM*
*wht u doin?*

*Daniel sent Yesterday at 11:24 AM*
*Layin in bed*

*You sent Yesterday at 11:24 AM*
*lol its almost noon silly*

*Daniel sent Yesterday at 11:24 AM*
*Just got a manicure*
*lkr lol*

*You sent Yesterday at 11:25 AM*
*lol wtf?*

*Daniel sent Yesterday at 11:25 AM*
*Wanna see*

*You sent Yesterday at 11:25 AM*
*yaaaa*

*Daniel sent Yesterday at 11:26 AM*
*Lies lol*

*You sent Yesterday at 11:28 AM*
*???*

*Daniel sent Yesterday at 11:28 AM*
*Loi jk*

*You sent Yesterday at 11:30 AM*
*show me nerd*

*Daniel sent Yesterday at 11:30 AM*
*Ohh yeah lol*

35. At approximately 1130 hours on March 25, 2021, Daniel sent a photograph of what appeared to be an erect penis covered by athletic shorts. Only the outline of the penis was visible, and a left hand was pulling the material of the shorts taut over the penis. Daniel unsent the message several seconds after Inv. Jones opened it; therefore, Inv. Jones was unable to document it. The chat continued:

*Daniel sent Yesterday at 11:31 AM*
*I forgot lol*

*You sent Yesterday at 11:41 AM*
*uhmm .. wow ...*

*Daniel sent Yesterday at 11:41 AM*
*U like my manicure*

*You sent Yesterday at 11:41 AM*
*uhm ... bahaha*

*is tht really u?*

*Daniel sent Yesterday at 11:42 AM*
*Yes*

*You sent Yesterday at 11:42 AM*
*jeeez*

*Daniel sent Yesterday at 11:42 AM*
*Wjy u say dat*
*U like*

*You sent Yesterday at 11:43 AM*
*bahaha idk ive never seen tht b4 lmaoff*

*Daniel sent Yesterday at 11:44 AM*
*Wow really u kidding*
*Ohhhh my baddd then*

*You sent Yesterday at 11:45 AM*
*bahaha its ok 8*

*Daniel sent Yesterday at 11:46 AM*
*I deleted*

*You sent Yesterday at 11:46 AM*
*lmaoy*

*Daniel sent Yesterday at 11:47 AM*
*ldk maybe too much for you*

*You sent Yesterday at 11:47 AM*
*haha i dont think so*

*Daniel sent Yesterday at 11:47 AM*
*Ohhh really*
*U think u can hang?*

*You sent Yesterday at 11:49 AM*
*uhm duh ...*

*Daniel sent Yesterday at 11:49 AM*
*Lies lol*
*Really?*

*You sent Yesterday at 11:50 AM*
*ahaha ya y wouldnt i be?*

*Daniel sent Yesterday at 11:50 AM*
*ldk ??? Loi*

36. At approximately 1150 and 1151 hours, Daniel sent two short videos. The first video started by showing Daniel's face, then traversed down to show his exposed and erect penis. The video then cut to a "Likee" end screen. Of note, Likee is a short video sharing application similar to TikTok. The ending screen displayed a Likee ID of 637385739. The second video was only of an erect male's penis, but then cut to the Likee ending screen. The Likee ID was listed as "daniel_patterson." Daniel "unsent" both of these videos; however, Inv. Jones was able to take a recording of both videos before they were "unsent". These videos were added to the case file. The chat continued:

*You sent Yesterday at 11:52 AM*
*omg r they all tht big??*

*Daniel sent Yesterday at 11:53 AM*
*No prob not*
*Most are small*

*You sent Yesterday at 11:53 AM*
*bahaha thts hot ...*

*Daniel sent Yesterday at 11:54 AM*
*Ty*
*Cum try*

*You sent Yesterday at 11:54 AM*
*try wht?*

*Daniel sent Yesterday at 11:54 AM*
*It*

*You sent Yesterday at 11:54 AM*
*ur dick lmao?*

*Daniel sent Yesterday at 11:54 AM*
*Yes*

*You sent Yesterday at 11:54 AM*
*lol i wouldnt even kno wht to do ..*
*bahaha is tht bad?*

*Daniel sent Yesterday at 11:55 AM*

*Lmao dammm it*
*No not really thats normal*
*What would u want to do with it*

<u>*You sent Yesterday at 11:55 AM*</u>
*uhm idk ... like wht would u want me 2 do?*

<u>*Daniel sent Yesterday at 11:56 AM*</u>
*Put it inside you*
*Make you feel good*

<u>*You sent Yesterday at 11:56 AM*</u>
*does it hurt? ... all my friends say it hurts really bad tha 1st time ...*

<u>*Daniel sent Yesterday at 11:56 AM*</u>
*Idk maybe a Iii*

<u>*You sent Yesterday at 11:58 AM*</u>
*haha thts kinda scary tbh lmao*
*but id prolly b down 2 try it*

<u>*Daniel sent Yesterday at 11:59 AM*</u>
*I understand*
*Kool lmk boo*
*When u ready*

<u>*You sent Yesterday at 11:59 AM*</u>
*Gwht else wud u wanna do?? fol like all ive ever done is make lmao*

<u>*Daniel sent Yesterday at 12:00 PM*</u>
*Whatever u like boo*
*If you need help you can call your friends*

<u>*You sent Yesterday at 12:01 PM*</u>
*Bahaha na they wud be awkward af ...*

<u>*Daniel sent Yesterday at 12:01 PM*</u>
*Theres plenty*

<u>*You sent Yesterday at 12:04 PM*</u>
*How wud I like not get pregnant thou?? Cuz like dad would def find out and kill me lmao*

<u>*Daniel sent Yesterday at 12:05 PM*</u>
*Ill pull out*

*I wont nut inside you*

*You sent Yesterday at 12:05 PM*
*Does tht work?? My health teacher said it doesn't work lmao*

*Daniel sent Yesterday at 12:06 PM*
*Lmao yess of. Course*
*Or we can use a condom*
*Either way*

*You sent Yesterday at 12:06 PM*
*They said condoms are way safer lmao ... is tht okay?*

*Daniel sent Yesterday at 12:08 PM*
*Yeah dont feel as good but hey*
*If i pop dat cherry. You will bleed tho ... dont get scared*

*You sent Yesterday at 12:09 PM*
*Ya my friends say tht happens too .. ugh I just don't want it 2 hurt ... i hate pain*

*Daniel sent Yesterday at 12:10 PM*
*It might at first. But then you will love it*
*And want it all the time*

*You sent Yesterday at 12:10 PM*
*Ohhhkay ... hehe wht u doing next week?*

*Daniel sent Yesterday at 12:10 PM*
*Real talk*
*No plans boo sup*

*You sent Yesterday at 12:10 PM*
*Well dad will be out of town for a day 4 work ....*

*Daniel sent Yesterday at 12:11 PM*
*Where u stay at again*
*Ohhh nice*

*You sent Yesterday at 12:11 PM*
*Sterling*

*Daniel sent Yesterday at 12:11 PM*
*Ohhh dammm lol*
*Far but ok*

*You sent Yesterday at 12:11 PM*
*?*

*Daniel sent Yesterday at 12:11 PM*
*All good*

*You sent Yesterday at 12:11 PM*
*So ...*

*Daniel sent Yesterday at 12:11 PM*
*Im down*
*If you are*

*You sent Yesterday at 12:12 PM*
*Va*

*Daniel sent Yesterday at 12:12 PM*
*Kk bet*

*You sent Yesterday at 12:12 PM*
*Haha this is Crazy*

*Daniel sent Yesterday at 12:12 PM*
*Lol why*
*We dont have too boo fr*

*You sent Yesterday at 12:13 PM*
*Lmao idk cuz I haven't even met u yet.. but u seem super sweet*

*Daniel sent Yesterday at 12:14 PM*
*Yeah i understand boo*
*We can wait if you want*

*You sent Yesterday at 12:14 PM*
*I like tht u call me boo*

*Daniel sent Yesterday at 12:14 PM*
*Not trying too rush ya*

*You sent Yesterday at 12:14 PM*
*It up 2 u ... im good I just havnt ever done anythin like this b4*
*Aww ur soooo sweet*

*Daniel sent Yesterday at 12:15 PM*
*Well maybe we should wait ... Im a man hun and your not 18*
*Yet*

*You sent Yesterday at 12:15 PM*
*Ugh but thats so long from now ... idk mayb u right thou ...*

*Daniel sent Yesterday at 12:16 PM*
*Yeah id love too but i dont wanna get either of us in trouble*

*You sent Yesterday at 12:17 PM*
*Me neither. .. my dad would kill me .. .l just dunno when the next time I would have the chance is*
*.. ya*
*kno?*

*Daniel sent Yesterday at 12:18 PM*
*Yeah i know i dont want that to happen ... And i dont want to either ... Soo unfortunately we*
*better wait*

*You sent Yesterday at 12:18 PM*
*I suck at ma kin decisions lmao*

*Daniel sent Yesterday at 12:18 PM*
*Sorry*

*You sent Yesterday at 12:19 PM*
*It's okay ... we could always just chill and c where it goes I guess. ldk.*

*Daniel sent Yesterday at 12:19 PM*
*Your a sweetie and i can wait*

*You sent Yesterday at 12:20 PM*
*Ya tht prolly a good idea ..*

*Daniel sent Yesterday at 12:20 PM*
*ldk if dats a good idea sumthing will gap pen i know it*

*You sent Yesterday at 12:20 PM*
*Truuuuu*

*Daniel sent Yesterday at 12:20 PM*
*Id love too tho*
*Dont get me wrong*
*Just not a good idea*

16

*You sent Yesterday at 12:20 PM*
*Ya I get it*

*Daniel sent Yesterday at 12:21 PM*
*When u turn 18*

*You sent Yesterday at 12:22 PM*
*Uhm Feb 1st in 4 years lmao*

*Daniel sent Yesterday at 12:22 PM*
*Your only 14?*
*I taught 16*

*You sent Yesterday at 12:22 PM Bahaha*
*I told u 14 silly goose*

*Daniel sent Yesterday at 12:22 PM*
*Omg smh yesss we need to wait ohhh lord*

*You sent Yesterday at 12:23 PM*
*??*

*Daniel sent Yesterday at 12:23 PM*
*I have a daughter thats 14*

*You sent Yesterday at 12:23 PM*
*Oh?*

*Daniel sent Yesterday at 12:24 PM*
*Dammmm girl what u be eating W*
*U look older*

*You sent Yesterday at 12:24 PM*
*Bahaha im like super mature 4 my age silly*

*Daniel sent Yesterday at 12:25 PM*
*I guesss*
*Loi*
*Dammmmm u got dat tight tight*

*You sent Yesterday at 12:25 PM*
*Loi wht u mean??*

*Daniel sent Yesterday at 12:25 PM*
*Id ruin u*
*Your pussy is tight af*

*You sent Yesterday at 12:25 PM*
*Huh?*
*Oh*
*Bahahha yeah*

*Daniel sent Yesterday at 12:25 PM*
*Omg*

*You sent Yesterday at 12:26 PM*
*Lol and u still don't want it??*

*Daniel sent Yesterday at 12:26 PM*
*I hate life*
*I doooooo baddd d*
*But i just cant. if we lived in mexicio*

*You sent Yesterday at 12:27 PM*
*Loi y would mexico change anything???*
*Bahaha it urs if u want it e*

*Daniel sent Yesterday at 12:28 PM*
*They age limit is 12*
*I dooooooooooo*
*Dammmm fml*

*You sent Yesterday at 12:28 PM*
*Sooooo bahaha*
*Hang on bath time*

*Daniel sent Yesterday at 12:28 PM*
*Ill go to prison.*
*Or id go right now*
*Yummy*

*You sent Yesterday at 12:29 PM*
*Bahaha well we cant get in trouble if we dont get caught silly*

*Daniel sent Yesterday at 12:30 PM*
*Smdh*
*Yeah but what if you get mad or dont like me after. Then u just gotta say sumthing*

*You sent Yesterday at 12:31 PM*
*0mg no I'd get in so much fucking trouble .. like my dad is crazy strict*

*Daniel sent Yesterday at 12:31 PM*
*Smdh u baddd*

*You sent Yesterday at 12:35 PM*
*Hehe well. .. u seem pretty cool U*

*Daniel sent Yesterday at 12:36 PM*
*Ohhhh im dope af !! A good man a great dad*
*But im single and horny af*
*Life sucks Joi*

*You sent Yesterday at 12:38 PM*
*Bahaha well I'm in the bath and my hands are wet 8so ill message u in a bit*

*Daniel sent Yesterday at 12:38 PM*
*Video chat*

*You sent Yesterday at 12:38 PM*
*Okie*

*Daniel sent Yesterday at 12:39 PM*
*Kk call*

37. At approximately 1241 hours, Daniel called Inv. Jones, still acting in the capacity as "Madison," via video chat. Inv. Jones screen recorded the call and turned the camera off once the chat began. Inv. Jones noted that the person on the video chat appeared to be the same person in the profile pictures on Daniel's Facebook.com page and the same person in Daniel Patterson's DMV photograph. The chat continued:

*Daniel sent Yesterday at 12:41 PM*
*Wow ok then*

*You sent Yesterday at 12:41 PM*
*Y couldn't I c u???*

*Daniel sent Yesterday at 12:41 PM*
*Idk you turned your cam off*

*You sent Yesterday at 12:42 PM*
*It like froze as soon as I turned it on ... wtf lmao ...*

*Daniel sent Yesterday at 12:42 PM*
*Try again*
*?*

*You sent Yesterday at 12:42 PM*
*My phone like takes pies but its always been shitty with vid chat*

*Daniel sent Yesterday at 12:43 PM*
*Soo take sum pies for me*
*In da shower*

*You sent Yesterday at 12:43 PM*
*Hehe ok ..*

38. At approximately 1243 hours, Inv. Jones sent Daniel the following photograph of a female's foot and leg in a bathtub:



*Daniel sent Yesterday at 12:43 PM*
*Kk bet*

*You sent Yesterday at 12:43 PM*
*(Smiling emoji)*

*Daniel sent Yesterday at 12:43 PM*
*Cute toes*

*You sent Yesterday at 12:43 PM*
*Thanks! I painted them myself.*

*Daniel sent Yesterday at 12:44 PM*
*Can i see the camel toe ?*

*More legs?*
*Dem boobies*

*You sent Yesterday at 12:44 PM*
*Camel toe??*

*Daniel sent Yesterday at 12:44 PM*
*Kitty*
*That pretty pink pussy*

*You sent Yesterday at 12:45 PM*
*Uhm ya after I get out of the bath ok?*
*Haha my boobies are small*

*Daniel sent Yesterday at 12:45 PM*
*Ohh ok hun*
*ldgaf*
*I wanna see*

*You sent Yesterday at 12:46 PM*
*Really??? Some guys r super mean about them*

*Daniel sent Yesterday at 12:46 PM*
*No im more of an ass man*
*I like lil boobies*

*You sent Yesterday at 12:47 PM*
*and u promise like not 2 show anyone or tell my dad right?*

*Daniel sent Yesterday at 12:47 PM*
*I promise baby*

*You sent Yesterday at 12:49 PM*
*Its just boys have like used me 4 pix b4 then like shown ppl or just nvr talked 2 me again ...*

39. Daniel then began sending voice clips in the chat. Inv. Jones requested that Washington County Sheriff's Deputy Jordan Steinke log in to "Madison's" account and send Daniel voice clips as well. At one point, Dep. Steinke tells Daniel she is getting dressed. Daniel replied via voice clip: "Oh well, uh, what happened to my pictures? Don't get dressed yet." Inv. Jones then sent Daniel a close-up photograph of a male law enforcement officer with a smooth chest wearing a bra. The chat continued:

*Daniel sent Yesterday at 1:19 PM*
*No fair cheater*
*They nice*

*You sent Yesterday at 1:19 PM*
*They small*

*Daniel sent Yesterday at 1:19 PM*
*Not small*

*You sent Yesterday at 1:19 Pl\.'*
*Cheater?*

*Daniel sent Yesterday at 1:20 PM*
*Yes u used a bra*
*Not cool*

*You sent Yesterday at 1:20 PM*
*Haha u want me 2 take it off??*

*Daniel sent Yesterday at 1:20 PM*
*Yesss*

40. Inv. Jones then sent Daniel a close-up photograph of the same male law enforcement officer's chest, with his arm covering his nipples. Daniel continued to ask for photographs of "Madison's" vagina. Inv. Jones later sent him a close-up photograph of the top of his hand where his thumb meets the back of his hand. The photograph was intended to represent a vagina. The chat continued:

*Daniel sent Yesterday at 2:01 PM*
*Try again not so close*

*You sent Yesterday at 2:01 PM*
*ugh its weird lmao ...*

*Daniel sent Yesterday at 2:02 PM*
*Why lol*
*Ur good*

*You sent Yesterday at 2:02 PM*
*lol cuz... nvr done pies down there b4 ...*

*Daniel sent Yesterday at 2:02 PM*
*Its ok*
*Try again*

41. The chat continued with Daniel sending voice clips asking if "Madison" always shaves her vagina, making her swear on the bible that she would never say anything if he came to meet her, and that he

would "love to eat her pussy, so good." Daniel then sent voice clips asking if "Madison" had ever came before, then explained that meant having an orgasm. He then asked if "Madison" had ever played with herself in the bath. Daniel continued to request nude photographs of "Madison," told her to masturbate while recording it, and continued to describe sexually explicit conduct. Daniel continued to agree to meet with "Madison" on March 31, 2021 as he believed her dad would be out of town for the day; however, on March 29, 2021, Daniel stated that he wouldn't meet with "Madison" because she is his daughter's age.

42. On March 31, 2021, Inv. Jones applied for and was granted an arrest warrant for Daniel Patterson in the Logan County District Court in Logan County, Colorado for C.R.S. 18-3-305 (1), Enticement of a Child; C.R.S. 18-3-306 (1), Internet Luring of a Child; C.R.S. 18-3-405.4 (l)(a), Internet Sexual Exploitation of a Child; and C.R.S. 18-3-405.4 (l)(b), Internet Sexual Exploitation of a Child; all class 4 felonies. Inv. Jones contacted the US Marshal's Violent Offender Task Force and requested their assistance in taking Daniel into custody.

43. On March 30, 2021, Inv. Huston surveilled 1523 Tennyson Street in Denver, Colorado, and noted a silver Chrysler 300C (bearing Oklahoma registration GJT-865) and a green Chevy Monte Carlo parked in front of 1523 Tennyson Street. The house had a red front door.

44. Of note, on March 25, 2021 at approximately 1556 hours, Daniel had sent "Madison" a photograph of his apparently erect penis covered by his shorts. In the background of the photograph was a red door. Inv. Jones took a screenshot of this message and added it to the case file. Daniel later "unsent" the message. The red door in the photograph appeared to be the same red front door of 1523 Tennyson Street. Inv. Huston, Deputy US Marshal (DUSM) Loretta Sanchez, DUSM Gillian Fleck, and Inv. Jones surveilled 1523 Tennyson street starting at approximately 1200 hours on March 31, 2021 while waiting for assistance from other task force officers from the Lakewood Police Department. Investigators observed Daniel Patterson exit and enter the residence multiple times.

45. At approximately 1450 hours on March 31, 2021, Daniel departed his residence in the Chrysler 300C, drove to a nearby McDonald's, then returned to his residence. As he was parking, at approximately 1502 hours, Agents from the Lakewood Police Department, DUSM Sanchez and Fleck, and Inv. Huston and Inv. Jones initiated a vehicle assault on Daniel's 300C. The Lakewood police agents were Agent Chris Loveall, Agent John Hinterreiter, Agent Pat Dunlevy, Agent Byron Allen, and Sergeant Louis Tomasetti. Daniel was ordered out of his vehicle and taken into custody without issue.

46. The driver's side front window of Daniel's vehicle was rolled down, and Inv. Jones observed a cell phone on the driver's seat in plain view. Inv. Jones reached into the window and seized Daniel's phone. The phone was a blue LG Cricket phone bearing IMEI: 354660118316259 with an orange/ clear case. Before Daniel was transported from 1523 Tennyson Street, he requested to call his father. Daniel had stated his father was inside of the residence.

47. Daniel was sitting on his front lawn while in handcuffs, Inv. Jones brought his phone to him and asked him for his PIN code to unlock his phone. Daniel told Inv. Jones that the PIN code was 122313. At Daniel's direction, Inv. Jones went into his contact list and dialed the contact titled "Dad." Inv. Jones placed the phone on speaker phone, but there was no answer. Inv. Jones secured Daniel's phone in his vehicle until it was placed into secure evidence.

48. DUSM Sanchez then spoke with Daniel while Daniel was seated in an unmarked police vehicle after Daniel had been advised of his Miranda warning and waived his rights. Inv. Jones later signed DUSM's

advisement form as a witness, and DUSM Sanchez later sent Inv. Jones a photograph of the advisement form which was added to the case file.  In response to DUSM Sanchez's questions, Daniel stated the following (paraphrased):

- He stated that he was a resident of Oklahoma and had been in the Denver area for approximately ten days to check on his father and kids. He has two daughters, ages 14 and 16 years old, who reside with their mother in Littleton, Colorado.
- He stated that he arrived in Denver on March 22, 2021 and planned to leave in a day or two. He said that he went back and forth between Oklahoma and Colorado; his address was 821 Edgewood Dr., Ponca City, Oklahoma; and he owns a car wash in Ponca City, Oklahoma.
- He stated that he went to the Denver Police Department and was told that he would not need to register as a sex offender there if he was present in Denver less than fourteen days. He said that he does not stay in Colorado more than fourteen days and that he did not inform Oklahoma when he was leaving to travel to Colorado.
- He stated that he was a life-time sex offender registrant and has to register quarterly. He said he completed probation in Oklahoma in April of 2020 for his 2nd Degree Rape conviction.
- He stated that he planned to move to Colorado soon but did not know when and had not secured employment in Colorado.

49. Daniel was transported to the Jefferson County Jail by two Lakewood Police Agents. Inv. Jones met them at the jail. At approximately 1623 hours, Inv. Jones met with Daniel in an interview room at the Jefferson County Jail. Inv. Jones recorded the interview using his digital voice recorder. The interview lasted approximately 29 minutes. Daniel stated that he had not consumed any drugs or alcohol today other than smoking some marijuana earlier in the day. Inv. Jones reminded Daniel of his rights then began the interview. In response to Inv. Jones' questions, Daniel stated the following (paraphrased):

- He has a Facebook account titled Daniel Patterson. No one else has access to his account. Inv. Jones showed Daniel a screenshot of the home screen of his account, and he identified it as his account.
- Inv. Jones showed Daniel a screenshot of Madison's account, and he said he remembered talking to that account. Madison is young. She is 14 or 16, but he couldn't recall. Madison wanted him to go see her. Madison said her dad was going out of town. Madison lives in Sterling. Today, Madison said she was in Edgewater and wanted to see if he would meet her, but he didn't go meet her.
- Madison said she had never had sex. He remembered telling Madison that he would use condoms. He possibly told Madison that when he "popped that cherry" that she would bleed. He sent Madison videos of his penis. He asked Madison for nude photographs. He later told Madison he had a daughter her age. He has a daughter who is 14 and another daughter that is 16.
- He remembered asking Madison today if he wanted to pick her up from the park. He wouldn't have picked Madison up if she would've asked. He just got caught up in the moment when he was talking to Madison. He didn't realize what Madison's age was during the chat.
- Inv. Jones told Daniel that there was a lengthy chat about her age being 14, then additional sexually explicit chat ensued. He was never going to meet her. It was a stupid mistake talking to her once he found out how old she was.
- Inv. Jones asked him what he thinks should happen to him. Nothing bad should happen to him because nothing actually happened. Inv. Jones asked him what he would do if a 46-year-old male had the same exact chat with his 14 year old daughter. He would be upset and

24

would tell the guy to leave his daughter alone, but he wouldn't involve law enforcement. If there was no harm done, then there should be no repercussions.

- There will be no other messaging threads on his phone with other underage girls. This was a one-time deal. He is not attracted to kids. His previous charge in Oklahoma is the only time he has had sexual contact with a minor.
- Inv. Jones asked Daniel if he had anything to say to Madison's family. He would tell them that he never meant to cause any trouble, and that it was just talking.    Inv. Jones offered Daniel the opportunity to write an apology letter to Madison's family, but he declined.
- Inv. Jones asked Daniel if he was sorry about what happened. He wasn't really sorry because nothing happened, and he didn't do anything. Inv. Jones asked him if he actually thought that saying those things to a child and sending her videos of his penis was wrong. Daniel responded that Yes, those things were wrong.
- Inv. Jones asked Daniel if he would be willing to submit to a polygraph examination, which he agreed to. However, Inv. Jones was unable to arrange for a polygrapher to administer the examination. Daniel asked for an explanation for his charges. Inv. Jones told him what he was being charged with and explained the basic elements.

50. Inv. Jones then concluded the interview, waited for Daniel to be booked in, then departed the jail.

51. In conjunction with transporting Patterson to Logan County on the arrest warrant Inv. Jones transported the phone back to Logan County.

52. On April 2, 2021, Inv. Jones applied for and was granted a search warrant in the Logan County District Court in Logan County, Colorado for Daniel Patterson's LG Cricket cell phone bearing IMEI: 354660118316259.

53. On April 6, 2021, Detective David Hosier of the Brush Police Department (in adjacent Morgan County, Colorado) assisted on the investigation and conducted a forensic examination of the LG Cricket cell phone pursuant to the above-described warrant. The instant search warrant application does not rely on any information or data recovered from the above-mentioned forensic examination as a basis to establish probable cause. The storage and examination of the cell phone was conducted in compliance with forensic standards which preserve the integrity of the data contained within the cell phone as it existed at the time of the recovery from Daniel Patterson's possession on March 31, 2021.

54. On May 6, 2021, Inv. Jones transferred custody of Daniel Patterson's LG Cricket phone bearing IMEI: 354660118316259 to the HSI Evidence Room located at 4645 W. 18th Street, Suite 500, Greeley, Colorado, 80634.

55. On or about April 6, 2021, Patterson was released from the Logan County Detention Center on a $50,000 bond while the charges stemming from the above-described arrest are still pending in the 13th Judicial District of Colorado. The next court appearance for this case is currently scheduled for June 7, 2021.

56. On or about April 8, 2021, Daniel Patterson registered as a sex offender with the Denver Police Department, based on his previous 2017 felony conviction in Oklahoma for 2nd degree rape of a minor. Patterson listed 1523 Tennyson Street, Denver, CO 80204 as his home address.

57. I learned from DUSM Sanchez that prior to his arrest on March 31, 2021, Daniel Patterson never registered as a sex offender in Colorado following his release from custody in Oklahoma. DUSM

Sanchez provided documents from Daniel Patterson's conviction in Oklahoma including copies of the Oklahoma Sex Offender Registration Act - Notice of Duty to Register form and Oklahoma Law Enforcement Address Verification Forms. The Oklahoma Sex Offender Registration Act - Notice of Duty to Register form was signed by Daniel Patterson on March 25, 2019 and informed him of the requirement to update his registration if he moves elsewhere. The Oklahoma Law Enforcement Address Verification Forms completed by Daniel Patterson shows that he signed the forms to report his address in Oklahoma from 2019 through 2021.

58. Inv. Jones spoke to a neighbor of Mr. Patterson's who he identified as Shyam Goswami of 1545 Tennyson Street. Mr. Goswami informed Inv. Jones that Mr. Patterson had lived at 1523 Tennyson street for approximately over a year. Inv. Jones also spoke to a neighbor who identified himself as Jon Borlund. Mr. Borlund informed Inv. Jones that Mr. Patterson had lived at that address for approximately eight months to a year.

59. A review of Denver Police Department records show that police responded to the 1523 Tennyson Street address on March 3, 2020; April 25, 2020; and July 3, 2020; and on each occasion Daniel Patterson was determined to be a resident at that address.

## INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN AND CREATE, POSSESS, AND/OR RECEIVE CHILD PORNOGRAPHY

60. Based on my previous training and experience related to investigations involving child pornography and the sexual abuse of children, I have learned that individuals who possess, receive, or access with intent to view child pornography have a sexual interest in children and in images of children. Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

   A. The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

   B. The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children. Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that is used to communicate with others about sexual activity or interest in children. Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant. In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

   C. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. They almost always maintain their collections in the privacy and security of their homes, cars, garages, sheds, and other secure

storage locations, such as in a digital or electronic format in a safe, secure, and private environment, including in cloud-based storage online or on their person.

D.   The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support.  This contact helps these individuals to rationalize and validate their deviant sexual interest and associated behavior.  The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

E.   The majority of individuals who create and collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children, as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires.  Such individuals rarely destroy these materials because of the psychological support they provide.

F.   The majority of individuals who create and collect child pornography often collect, read, copy or maintain names, screen names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests.  These contacts are maintained as a means of personal referral, exchange or commercial profit.  These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

G.   Based upon training and experience, your Affiant knows that persons in engaged in the production and possession of child erotica are also often involved in the production and possession of child pornography.  Likewise, your Affiant knows from training and experience that persons involved in the production and possession of child pornography are often involved in the production and possession of child erotica.

Based on my training, knowledge, experience, and conversations with others in law enforcement, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage devices and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or Internet email or online storage accounts that s/he possesses.  Additionally, based on this training and experience, I understand that an individual who discusses the sexual abuse and/or exploitation of children on one digital storage device is likely to conduct those communications on additional digital storage devices that s/he possesses.

## CONCLUSION

61. Based on the investigation described above, probable cause exists to believe that inside the Device(s) (more fully described on Attachment A), will be found evidence, fruits, and instrumentalities of a violation of Title 18, United States Code, Sections 2250(a)(1), (2)(B), and (3); 2251(a) and (e); 2252A(a)(2) and (b)(1); and 2422(b) (described on Attachment B).

62. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.


　　　　　　　　　_s/ Darrell Franklin_____
　　　　　　　　　Darrell Franklin, Special Agent
　　　　　　　　　Homeland Security Investigations


SUBSCRIBED and SWORN before me this __24th__ day of May 2021.

_____
HON. S. KATO CREWS
UNITED STATES MAGISTRATE JUDGE


Application for search warrant was reviewed and is submitted by Melissa Hindman, Assistant United States Attorney.